UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BANK OF AMERICA, N.A.,<br><br>      Plaintiff,<br><br>v.<br><br>BARNES HILL LLC,<br>ALAN J. BANKART,<br>DIANE K. BANKART, and<br>JPMORGAN CHASE BANK, N.A.,<br><br>      Defendants. | Case No: 16-cv-11583-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                         **May 13, 2019**

**I.   Introduction**

Plaintiff Bank of America, N.A. ("BANA") has filed this lawsuit against Defendants Alan J. Bankart and Diane K. Bankart (the "Bankarts") and their company, Barnes Hill, LLC ("Barnes") (collectively, the "Bankart Defendants"), in connection with BANA's interest in a line of credit agreement entered in 2000 and secured by a mortgage on the Bankarts' property. D. 50. BANA also seeks a declaration that, among other things, BANA's mortgage takes priority over any interest that JPMorgan Chase Bank, N.A. ("Chase") may have arising from the later 2006 refinancing agreement with the Bankarts. Id. Chase and the Bankart Defendants, in turn, filed counterclaims against BANA and crossclaims against one another. D. 52; D. 67; D. 68. BANA has moved for partial summary judgment on Chase's counterclaims, D. 134, and BANA's claims

and counterclaim against the Bankart Defendants, D. 39; D. 133.[1] The Bankart Defendants filed a motion for summary judgment with respect to their counterclaims against BANA. D. 139. Finally, Chase has moved for summary judgment on its counterclaims and an affirmative defense against BANA. D. 135. For the reasons stated below, the Court DENIES BANA's motion for summary judgment against Chase, D. 134, and ALLOWS IN PART and DENIES IN PART as moot Chase's motion for summary judgment against BANA, D. 135. The Court DENIES the Bankart Defendants' motion, D. 139, and ALLOWS BANA's motions against the Bankart Defendants, D. 39; D. 133.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant "bears the burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest merely on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986),

---

[1] On September 27, 2017, the Court denied without prejudice BANA's partial motion for summary judgment against the Bankarts. D. 63 (denying D. 39). On November 13, 2018, BANA, nonetheless, filed a supplemental memorandum in support of that motion. D. 133. The supplemental memorandum, D. 133, relies upon the statement of material facts set forth in BANA's original memorandum in support of summary judgment against the Bankarts, D. 40, and cites to the exhibits filed as attachments thereto, see, e.g., D. 40-1; D. 40-2. Given the stage of the litigation and the other pending motions for summary judgment, the Court will treat BANA's supplemental memorandum as a pending renewed motion for summary judgment and considers the previously filed statement of material facts and exhibits for the purpose of resolving the same.

but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor," Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (alteration in original) (quoting Anderson, 477 U.S. at 249). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

### III.   Factual Background

These relevant facts are drawn from the statements of material fact and supporting documents and are undisputed unless noted otherwise. On November 7, 1997, the Bankarts purchased a property on Weetamo Road, Nantucket, Massachusetts (the "Property"). D. 140 ¶ 1; D. 139-1; D. 145 ¶ 1. In May 2000, the Bankarts transferred the Property by quitclaim deed to Defendant Barnes, D. 140 ¶ 2; D. 139-2; D. 145 ¶ 2, a company owned by the Bankarts, D. 140 ¶ 4; D. 139-3 at 10-11; D. 145 ¶ 4. Shortly thereafter, the Bankarts executed an agreement with Fleet Bank in which they received a $4 million line of credit (the "Fleet Line Agreement"). D. 40 at 2; D. 40-1 at 6-8; see D. 152 ¶ 4 (acknowledging that the Bankarts received a "four million dollar credit facility" from Fleet Bank). Prior to the institution of this litigation, BANA was unable to locate the loan origination file or the original Fleet Line Agreement. D. 40 at 4; D. 40-1 at 3. On August 8, 2018, however, BANA located the original Fleet Line Agreement and invited the parties to inspect the same. D. 147-1 at 1-7; D. 147-2 at 2, 6. According to BANA, as of the time

the original Agreement was filed with the Court, the Bankarts had not responded to BANA's offer to make it available for inspection. D. 147 at 2, 6.

The Fleet Line Agreement, including the $4 million line of credit, was secured by a mortgage on the Property. D. 40 at 2; D. 40-4 at 2 (indicating in document entitled "Fleet Bank Open-End Mortgage" that the line of credit at issue was secured by a mortgage on a property at "1 Weetamo Rd, Nantucket, MA 02554"). The Bankarts deny that the Fleet Line Agreement was secured by a mortgage on the Property, D. 152 ¶ 6, but do not otherwise dispute the authenticity of the mortgage document, D. 152 ¶ 8. The Bankarts signed the mortgage on behalf of Barnes, which is listed as the "mortgagor/borrower." D. 40-4 at 6; see D. 40 at 2; D. 152 ¶ 7. The mortgage was recorded on April 26, 2002. D. 40-4 at 2.

BANA asserts that it merged with Fleet Bank on or about March 8, 2004, D. 40 at 3; D. 40-5, and, thus, BANA inherited the Bankarts' mortgage ("BANA Mortgage"). Following the merger, the Bankarts issued repayments pursuant to the Fleet Line Agreement to BANA. D. 40 at 3; D. 40-2 at 38-39 (acknowledging receipt of monthly statements from Bank of America "from when [the Bankarts] first re-drew the line [of credit] down starting in 2006 through 2014"); D. 152 ¶ 11. At some point in or around 2014, the Bankarts ceased making payments to BANA. D. 40 at 3; D. 40-2 at 39; D. 152 ¶ 12. Although the Bankarts acknowledge that "they owe [BANA] approximately $4 million," they "dispute . . . whether their obligations to pay this debt is subject to the Fleet Line Agreement[] or whether the Fleet Line Agreement is enforceable." D. 152 ¶ 12.

On November 7, 2005, Alan Bankart informed Washington Mutual ("WaMu") that he intended to refinance the Property to pay off a "home equity line" with BANA. D. 154 ¶ 10; D. 154-1 at 46; D. 157 ¶ 10. Shortly thereafter, WaMu sent the Bankarts a commitment letter indicating that WaMu had approved their application for a residential mortgage loan secured by

the Property. D. 134 at 3; 134-6 at 2. The commitment letter also states that WaMu shall have "no obligation [pursuant to the pending mortgage agreement] unless all the foregoing conditions have been satisfied in full, all required documents are signed, and funds actually disbursed on or prior to December 14, 2005." D. 134-6 at 2. One of the conditions required the Bankarts to provide evidence that their BANA debt was "paid in full at closing and security interest released." Id. at 3. A similar commitment letter, dated January 17, 2006, reiterated this condition. D. 154 ¶ 12; D. 134-7 at 2; D. 157 ¶ 12. According to Chase, as part of the refinancing process, BANA sent WaMu a payoff statement identifying the Bankarts' outstanding balance and the Bankarts' executed loan modification agreement, which requested that BANA block and close their line of credit upon receipt of payment in full. See D. 154 ¶ 13 (stating that BANA sent WaMu a copy of the Bankarts' payoff statement); D. 154 ¶¶ 24-25 (stating that BANA sent WaMu a copy of the Bankarts' executed modification agreement, which instructs BANA to block the Bankarts' account and close it when the outstanding balance is paid to zero). BANA denies sending these documents to WaMu. D. 157 ¶¶ 13, 24-25.

On or about January 19, 2006, Barnes and WaMu executed a promissory note in the amount of $5 million secured by a mortgage on the Property. D. 154 ¶ 16; D. 154-1 at 64-89; D. 157 ¶ 16. The Bankarts signed the promissory note on behalf of Barnes. D. 154-1 at 80. That same day WaMu generated lender closing instructions, advising the Bankarts' settlement agent, Glidden & Glidden, P.C., that it was not authorized to disburse the proceeds from the pending agreement until the Property was cleared of "all liens and encumbrances to ensure that the Lender holds a valid first lien position." D. 134 at 5; D. 134-8 at 3. On or around January 20, 2006, the Bankarts executed a request to terminate their BANA line of credit, which had a payoff balance of over $4 million. D. 154 ¶ 18; D. 154-1 at 91-92; D. 157 ¶ 18. As part of the termination process, the

Bankarts requested that BANA block and close their line of credit account from further use "immediately" and terminate the same upon receipt of payoff. D. 154 ¶ 19; D. 154-1 at 96; D. 157 ¶ 19. Chase alleges, and BANA disputes, that BANA sent the Bankart's request for termination to Chase. D. 154 ¶ 21; D. 157 ¶ 21.

The WaMu mortgage was recorded on January 25, 2006. D. 154 ¶ 27; D. 157 ¶ 27. That same day, WaMu wired $4,013,649.24 to BANA. D. 154 ¶ 28; D. 157 ¶ 28. At the time, WaMu understood that its mortgage on the Property was in "first position," D. 134-5 at 17 (confirming that WaMu believed "the title [to the Property] cleared of all liens and encumbrances such that Washington Mutual held the first lien position . . . since [WaMu] had just paid off $4 million to Bank of America"), but took no affirmative action with BANA or the Bankarts to confirm the same, D. 144-1 at 14-15 (stating there was no indication from WaMu's files that it took steps to confirm that BANA discharged a mortgage on the Property).

Because WaMu overpaid on the outstanding balance, BANA provided a refund of slightly more than $3000 to the Bankarts on February 2, 2006. D. 154 ¶ 33; D. 142-3 at 15; D. 157 ¶ 33. Per BANA's policy, a block should have been placed on the Bankart's' account upon receipt of the refund, which zeroed the balance of the line of credit. D. 154 ¶ 34; D. 154-1 at 58 (explaining that "the block should have been placed on [the account] at that time" but "[u]nfortunately, it wasn't done timely"); D. 157 ¶ 34. BANA, however, did not close or block the account. D. 154 ¶ 34; D. 154-1 at 58; D. 157 ¶ 34. On February 15, 2006, the Bankarts began to withdraw funds from the line of credit. D. 154 ¶ 35; D. 142-3 at 15; D. 157 ¶ 35. Because the Bankarts utilized the line of credit prior to BANA closing the account, BANA was unable to block the account and discharge the BANA Mortgage. D. 154 ¶ 38; D. 154-1 at 58; D. 157 ¶ 38. The Bankarts eventually

withdrew $4 million, including the sum recently paid off by Chase, on the line of credit. D. 154 ¶ 41; D. 142-3 at 15-19; 157 ¶ 41.

Upon the dissolution of WaMu in September 2008, the WaMu Mortgage was assigned to Chase. D. 154 ¶ 44; D. 154-1 at 107; D. 157 ¶ 45. The Bankarts ceased making payments after November 2012. D. 134 at 7; D. 134-5 at 27. Between 2012 and 2016, Chase delayed initiating foreclosure proceedings as part of its loss mitigation effort with the Bankarts. D. 134-5 at 30. On or about August 29, 2016, during initial foreclosure proceedings on the Bankarts' Property, Chase learned from BANA that BANA had not blocked the Bankarts' line of credit account following the January 2006 refinance. D. 154 ¶ 51; D. 157 ¶ 51; see D. 134-5 at 34 (explaining that Chase learned the BANA mortgage continued to burden the Property after running a title search during foreclosure proceedings and receiving confirmation from BANA that the Bankarts' line of credit account had an outstanding balance).

### IV.    Procedural History

BANA instituted this action on August 3, 2016. D. 1. In June 2017, Chase filed a related action in Nantucket Land Court, which BANA removed to this Court. D. 54 at 2. On August 25, 2017, BANA move to consolidate the action, D. 62, which the Court allowed, D. 62. BANA filed a second amended complaint. D. 50. Chase and the Bankart Defendants filed counterclaims against BANA and crossclaims against one another. D. 52; D. 67; D. 68. BANA has now moved for partial summary judgment against Chase, D. 134, and the Bankart Defendants, D. 39; D. 133. The Bankart Defendants filed a motion for summary judgment against BANA. D. 139. Chase has moved for summary judgment against BANA. D. 135. The Court heard the parties on the pending motions on January 17, 2019 and January 24, 2019 and took these matters under advisement. D.

161; D. 163. BANA and Chase filed supplemental memoranda of law concerning Chase's counterclaims. D. 164; D. 165; D. 166.

## V. Discussion

### A. Chase's Counterclaims Against BANA

The Court will first address BANA and Chase's motions for summary judgment on Chase's counterclaims seeking equitable subrogation (Count I), a declaratory judgment that the Chase Mortgage has priority over the BANA Mortgage (Count II), promissory estoppel (Count III) and a counterclaim for "breach of contract, third-party beneficiary, breach of warranty and representation" (Count IV).

#### 1. *BANA's Motion for Summary Judgment Satisfies Local Rule 56.1*

Chase initially contends that BANA's motion for summary judgment is "procedurally improper" because BANA's statement of material facts is not consistent with Local Rule 56.1. D. 153 at 5. Rule 56.1 provides, in relevant part, that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." L.R. 56.1. Chase opines that BANA's statement of material facts is "rife" with statements that do not cite to supporting documentation, as well as legal arguments and legal conclusions. D. 153 at 5. The Court has broad discretion to accept a party's statement of material facts as stated. See Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). Here, the Court has not relied upon unsupported assertions or legal conclusions in reaching its decision and declines to deny BANA's motion for summary judgment on this ground.

### 2. *Chase's Counterclaims are Not Time-Barred*

In support of its motion for summary judgment, BANA asserts that the operative statutes of limitations bar Chase's counterclaims. D. 134. With respect to the equitable subrogation claim, BANA urges the Court to adopt the six-year statute of limitations for breach of contract claims. Chase contends that claims for equitable subrogation are comparable to actions for the recovery of interest in land and, therefore, entitled to the twenty-year statute of limitations set forth in Mass. Gen. L. c. 260, § 21. The Court is not persuaded that the statute of limitations for breach of contract actions applies to equitable subrogation claims.

In Massachusetts, courts have distinguished equitable subrogation claims from contract actions and applied the twenty-year statute of limitations to such claims. See United Mortg. Servicing, LLC v. Long, No. 984870, 2004 WL 1926329, at *6 (Mass. Super. June 22, 2004) (explaining that claims for "equitable subrogation . . . are not barred by the six-year statute of limitations . . . because they are not contract actions"), aff'd sub nom. United Mortg. Servs., LLC v. Long, 66 Mass. App. Ct. 1107 (2006)). BANA appears to argue that United Mortg. Servicing is inapplicable here because Chase's requested relief, *i.e.*, prioritization of its mortgage over BANA's mortgage on the Property, purportedly sounds in contract rather than "a petition for recovery of land or an effort to revive a dormant or discharged interest in land." D. 158 at 6. In Deutsche Bank National Trust Co. v. Gibb, No. MICV201301110, 2016 WL 10077153 (Mass. Super. Feb. 3, 2016), however, the court relied upon United Mortg. Servicing in holding that the twenty-year statute of limitations applies where, as here, a mortgagee pressed an equitable subrogation claim to secure its position as senior lien holder on a property. Deutsche Bank, 2016 WL 10077153, at *2 (quoting United Mortg. Servicing in declining to apply the six-year statute of limitations for breach of contract claims to a mortgagee's claim for equitable subrogation and

9

declaratory relief). Like the mortgagee in Deutsche Bank, Chase seeks to establish its lien on the Property through equitable subrogation.

Because Chase's declaratory judgment counterclaim seeks the same relief as the equitable subrogation counterclaim, the former has the same statute of limitations applicable to the latter. See Gilbert v. City of Cambridge, 932 F.2d 51, 58 (1st Cir. 1991) (explaining that where "a claim for declaratory relief could have been resolved through another form of action which has a specific limitations period, the specific period of time will govern") (quoting Town of Orangetown v. Gorsuch, 718 F.2d 29, 42 (2d Cir. 1983)). Accordingly, Chase's counterclaims for equitable subrogation and declaratory judgment are entitled to a twenty-year statute of limitations.[2] Even assuming the earliest conceivable accrual date relevant to this action, Chase has asserted its equitable subrogation and declaratory relief counterclaims within the twenty-year statute of limitations. Accordingly, those counterclaims are not time-barred.

There is no dispute that a six-year statute of limitations applies to Chase's breach of contract and promissory estoppel counterclaims. The parties disagree as to when the applicable statute of limitations accrued. Under the Massachusetts discovery rule, the limitation period accrues when the plaintiff has "knowledge or sufficient notice of two related facts: (1) that [it] was harmed; and (2) that [the] harm was caused by the defendant's conduct." Harrington v. Costello, 467 Mass. 720, 725 (2014). "A plaintiff may be put on 'inquiry notice' where it is informed of facts that would suggest to a reasonably prudent person in the same position that an injury has been suffered as a result of the defendant's conduct." Commonwealth v. Tradition (N.

---

[2] BANA and Chase submitted supplemental briefs addressing Beaconsfield Towne House Condominium Trust v. Zussman, 401 Mass. 480 (1988), see D. 164; D. 165; D. 166, lends some further support to Chase's position regarding the application of the twenty-year statute of limitations.

Am.) Inc., 91 Mass. App. Ct. 63, 71 (2017).  Accordingly, the applicable statute of limitations begins to run on the date of the "first event reasonable likely to put the plaintiff on notice that the defendant's conduct . . . caused [its] injury."  AA & D Masonry, LLC v. S. St. Bus. Park, 93 Mass. App. Ct. 693, 699 (2018).

BANA asserts that Chase's contract-based counterclaims are time-barred because they accrued "immediately" following the completion of the refinancing in January 2006, when Chase purportedly should have known that BANA failed to discharge its mortgage on the Property.  D. 134 at 12.  BANA contends that a reasonably prudent plaintiff could have discovered the missing discharge by seeking evidence of the same or by conducting a title search after the refinance.  Id. at 10.  Even if Chase knew or should have known the discharge was missing or not recorded after it refinanced the Bankarts' account, there are no facts to suggest it also should have known BANA failed to block or close the account, see D. 154 ¶ 34; D. 157 ¶ 34, and allowed the Bankarts to withdraw funds after Chase paid-off the outstanding debt, see D. 154 ¶ 35; D. 157 ¶ 35.  Chase could not have discovered that BANA's internal missteps caused Chase's injury until August 29, 2016, i.e., when BANA informed Chase that it did not follow its own policies and, as a result, could not release the lien on the Property.  The Court, therefore, concludes that Chase's breach of contract and promissory estoppel counterclaims are not barred by the applicable statute of limitations.

Accordingly, BANA's motion for summary judgment, D. 134, is denied.

> 3. *Chase is Entitled to Summary Judgment as to its Equitable Subrogation and Declaratory Judgment Counterclaims Against BANA*

As to Chase's motion for summary judgment as to its equitable subrogation and declaratory relief, D. 135, Chase first argues the BANA Mortgage should be second in priority to Chase's mortgage on the Property pursuant to the doctrine of equitable subrogation.  The purpose of

equitable subrogation is to prevent unjust enrichment. Wells Fargo Bank, N.A. v. Comeau, 92 Mass. App. Ct. 462, 468 (2017). Accordingly, "[o]ne who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment." E. Bos. Sav. Bank v. Ogan, 428 Mass. 327, 330 (1998) ("Ogan") (quoting Restatement (Third) of Property (Mortgages) § 7.6(a) (1997)). In other words, a "new mortgage held by a mortgagor, who used the proceeds of the new mortgage to extinguish an earlier mortgage, may receive the same priority once given to the earlier mortgage." Id. To succeed on a claim for equitable subrogation, a party must show that: "(1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights of the junior lienholder." Id. (citation omitted).

There is no colorable dispute that Chase satisfies at least the first four prongs of the analysis. D. 154 ¶ 28; D. 154-1 at 98 (indicating that WaMu satisfied the Bankarts' BANA encumbrance on the same day it executed the promissory note secured by a mortgage on the Property). BANA, however, argues that Chase was negligent in failing to confirm the status of the BANA Mortgage. Even if the Court agreed that Chase was negligent—and it does not—courts in the Commonwealth have recognized that equity may require subrogation even where the junior lien holder had actual knowledge of the senior lien, see Ogan, 428 Mass. at 331 (explaining that "knowledge is not necessarily fatal to the grantee's claim of subrogation, if equity would nonetheless dictate the recognition of subrogation" (quoting Restatement (Third) of Property (Mortgages) § 7.6 (1997))), and where the mortgagee's inability to identify the senior lien was the result of negligence, see id. (collecting cases). Where, as here, Chase "expected to have first

priority and paid a price that reflected that expectation" the Court is persuaded that equitable subrogation and a declaration reflecting Chase's priority are necessary to prevent unjust enrichment, id. at 334, particularly where BANA failed to close and block the line of credit and the Bankarts were able to continue drawing down on the account beginning on February 15, 2006 and thereafter. That is, between the two lenders, Chase has first priority ahead of BANA as to their respective mortgages on the Property as a matter of equitable subrogation. Chase's motion for summary judgment, therefore, is allowed with respect to the equitable subrogation counterclaim (Count I) and declaratory judgment counterclaim regarding the same (Count II).[3]

### B. BANA's Claims Against the Bankarts

That said, the Court still needs to address the rights as between BANA and the Bankarts. BANA has moved for summary judgment on its claim seeking a declaration of its right to rely on a copy of the Fleet Line Agreement to foreclose on the Property (in its capacity as junior lien holder) in lieu of the original document. D. 39. The Bankart Defendants, in turn, moved for summary judgment on their counterclaim against BANA also seeking clarification regarding

---

[3] In light of this ruling, the Court need not reach Chase's counterclaim for promissory estoppel or its defense of unclean hands or address the issue of whether to enforce the Mortgage Discharge Statute, Mass. Gen. L. c. 183, § 55, against BANA. Compare D. 165 at 1 with D. 166-1 at 2-3. Additionally, Chase's motion does not appear to press the breach of contract counterclaim (Count IV). As to BANA's assertion of *in pari delicto*, see D. 144 at 12, the Court agrees with Chase that BANA waived this affirmative defense by failing to assert it in its original answer, D. 53, and its amended answer, D. 74; D. 75. Fed. R. Civ. P. 8(c) (providing a non-exhaustive list of "any avoidance or affirmative defense"); Gray v. Evercore Restructuring LLC et al., 544 F.3d 320, 324 (1st Cir. 2008) (referencing *in pari delicto* as an affirmative defense); Wolf v. Reliance St. Life Ins. Co., 71 F.3d 444, 449-50 (1st Cir. 1995) (noting that "[f]ailure to plead an affirmative defense generally results in waiver of the defense and its exclusion from the case"); Davignon et al. v. Clemmey et al., 322 F.3d 1, 15 (1st Cir. 2003). Even if it were not waived or had been raised in a timely enough fashion not to amount to unfair prejudice, Davignon, 32 F. 3d at 15; D. 156 at 4-5, the doctrine does not apply here where the undisputed facts, as discussed fully above, show separate acts by BANA and Chase and not joint, wrongful action. See D. 156 at 5-6 (citing Choquette v. Isacoff, 65 Mass. App. Ct. 1, 3-4 (2005)).

BANA's rights and obligations under the Fleet Line Agreement. D. 139. Separately, BANA has moved for summary judgment on its breach of contract crossclaim against the Bankart Defendants. D. 133. The Court considers each in turn.

### 1. BANA is Entitled to Enforce the Fleet Line Agreement Against the Bankart Defendants

As an initial matter, the Bankarts challenge the enforceability of the Fleet Line Agreement because BANA attached a copy of the document (as opposed to the original) when it filed the amended complaint. D. 139 at 5. The Court understands that BANA located the original Fleet Line Agreement and invited the Bankart Defendants to inspect it on August 8, 2018. D. 146 at 2; D. 147-1 at 1-7. During the hearing on January 17, 2019, BANA again offered Bankart Defendants an opportunity to review the Fleet Line Agreement. Because Bankart Defendants have not challenged the authenticity of the original Fleet Line Agreement, the Court considers its authenticity undisputed for the purposes of resolving the instant motions. The Bankart Defendants next argue that BANA cannot enforce the Agreement because it was signed by the Bankarts in their individual capacity and not by Barnes in its corporate capacity. As Barnes' sole managers, the Bankarts were authorized to enter a mortgage agreement on its behalf. D. 40-2 at 68 (describing the Bankarts' authority as managers of Barnes pursuant to the entity's Operating Agreement). The Court concludes that BANA is entitled to enforce the Fleet Line Agreement against the Bankart Defendants to the extent such enforcement is consistent with the Court's ruling on the priority of the BANA Mortgage. The Court acknowledges the Bankart Defendants' concern expressed during the hearing that certain documents attached to BANA's opposition papers and purportedly concerning the Fleet Line Agreement were not produced in discovery. See D. 147-1; D. 147-2. Such documents, however, do not bear on the validity of the fully integrated promissory note and Fleet Line Agreement nor were they factored into the Court's consideration of the Bankart

Defendants' indebtedness to BANA. Moreover, to the extent Bankart Defendants were seeking to extend or expand the scope of discovery, it is not clear how the review of additional documents would change the Court's analysis of the validity or enforceability of the promissory note and agreements at issue here. The Court, therefore, denies the request for additional discovery to the extent pressed by any party here.

### 2. *BANA is Entitled to Summary Judgment on its Breach of Contract Claim*

BANA asserts that summary judgment is appropriate with respect to its breach of contract claim. To prove a breach of contract claim, a plaintiff must show there was a valid contract, the defendant breached the contract and that the plaintiff sustained injury as a result of the defendant's breach. Linton v. N.Y. Life Ins. & Annuity Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005). For the reasons previously discussed, the Fleet Line Agreement is a valid contract. The undisputed material facts indicate that the Bankart Defendants breached this agreement when they ceased making payments in or around 2014, D. 40 at 3; D. 40-2 at 39; D. 152 ¶ 12, and BANA has suffered over $4 million in damages as a result of that breach. Summary judgment is warranted as to BANA's breach of contract claim.

## VI. Conclusion

For the foregoing reasons, the Court DENIES BANA's motion for summary judgment against Chase, D. 134, and ALLOWS IN PART and DENIES IN PART as moot Chase's motion for summary judgment against BANA, D. 135. The Court denies the Bankart Defendants' motion, D. 139, and allows BANA's motions against them. D. 39; D. 133. In light of the Court's ruling on BANA and Chase's cross-motions, BANA's motion to strike Chase's expert affidavit is

DENIED as moot, D. 159, as the Court did not rely on the affidavit in resolving the pending motions.

The Court orders the parties to meet and confer in light of this ruling and file a status report by May 29, 2019 indicating what, if any, further deadlines, proceedings and/or form of judgment the Court should enter in this matter.

**So Ordered.**

/s/ Denise J. Casper<br>United States District Judge